UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-01887-REB

WILLSOURCE ENTERPRISE, LLC,

    Plaintiff,

v.

INTERIOR BOARD OF LAND APPEALS,
DAVID BERNHARDT, in his official capacity as the Secretary of the Interior, and
UNITED STATES DEPARTMENT OF THE INTERIOR,

    Defendants,

WILDERNESS WORKSHOP,

    Intervenor Defendant.

---

**ORDER**
_____

    This matter involves a Petition for Review of Final Agency Action filed by Plaintiff WillSource Enterprise, LLC ("WillSource").  WillSource seeks judicial review of two final decisions of the Interior Board of Land Appeals ("IBLA"), concerning certain federal oil and gas leases of which WillSource was the operator and lessee.  This matter has been fully briefed.  For the reasons set forth below, this court finds the decisions of the IBLA were neither arbitrary nor capricious, and that the IBLA's refusal to apply equitable estoppel to the government's actions was consistent with Tenth Circuit case law.

# I. Background

## A. *Regulatory Framework*

This case concerns leases administered under the Mineral Leasing Act of 1920, Pub. L. No. 66-146, in which Congress established a framework for the exploitation of minerals owned by the United States. The Act allows "the Secretary of Interior to lease mineral development rights for individual tracts of land to private mining concerns." *Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1254 (10th Cir. 2014). The Bureau of Land Management ("BLM") has the delegated responsibility for leasing and oversight of the development of federal minerals. 43 C.F.R. §§ 3100.0-3, 3160.0-3, 3180.0-3.

The Mineral Leasing Act allows for lessees within a single area to unite and contract with each other to form "a cooperative or unit plan of development or operation of a pool, field, or like area." 30 U.S.C. § 226(m). Such "unitization" is a "bow[] to geologic reality" by allowing more efficient exploration activities and avoiding "developers . . . draining pools of oil and gas lying partially within their own lease boundaries but extending into contiguous leaseholds." *Entek*, 763 F.3d at 1254–55.

If lessees choose to unitize, they must comply with certain regulations and agree to be bound by a unit agreement, which must be approved by the Secretary of the Interior. The regulations governing such agreements require parties to file an application with the

BLM, 43 C.F.R. § 3181.2, and then execute a unit agreement among themselves which is subject to approval by the BLM. *Id.* §§ 3181.3, 3181.4(a). The regulations provide a model unit agreement containing the standard terms. *Id.* § 3181.1.

A unit agreement offers significant advantages because it extends the lease term as long as the lease remains subject to a unit agreement, without the need to establish a well on each lease in the unit. *Id.* § 3107.3-1. But to ensure diligent exploration and development, a unit agreement imposes a strict drilling schedule, generally requiring the drilling of an initial well within six months, and a new well every six months thereafter. *Id.* §§ 3181.1, 3186.1.

Section 11 of the model unit agreement requires that once lessees complete a "well capable of producing unitized substances in paying quantities," they must submit a request for approval of a "participating area" containing a schedule of "all land then regarded as reasonably proved to be productive of unitized substances in paying quantities." *Id.* § 3186.1 (Model Unit Agreement, § 11). Critical to the issues in this case, section 2(e) of the model unit agreement provides that all subdivisions of land in a unit that are not part of the participating area "on or before the fifth anniversary of the effective date of the first initial participating area . . . shall be eliminated automatically from this agreement, effective as of said fifth anniversary." *Id.* (Model Unit Agreement,

§ 2(e)). The "effective date" of a participating area is defined as "the date of completion of" an initial well in the unit area. *Id.* (Model Unit Agreement, § 11).

In the event of an elimination pursuant to section 2(e), the unit operator must "describe the area so eliminated" within 90 days and "promptly notify all parties in interest." *Id.* Any leases eliminated pursuant to this provision are automatically extended for two years beyond the fifth anniversary. 30 U.S.C. § 226(m); 43 C.F.R. § 3107.4 ("Any lease eliminated from [a] unit plan . . . shall continue in effect for the original term of the lease or for 2 years after its elimination from the plan or agreement . . . .").

### B. Facts

The Willow Creek Unit Agreement ("Agreement"), which encompassed the three leases at issue in this case among several others (collectively, "the Willow Creek Unit"), was approved by the BLM on July 30, 2003. BLM000141. The relevant terms are identical to the model unit agreement, including and especially section 2(e), described above. The Agreement required the operator of the Willow Creek Unit to drill an initial well within six months after the effective date (i.e., by January 30, 2004), and to drill an additional well every six months thereafter.

The original unit operator, Delta Petroleum Corporation,[1] obtained an extension of the January 30, 2004 deadline, and ultimately completed the first well (designated the

---

[1] WillSource took over the role of unit operator in October 2006. BLM000198–201.

4

Little Beaver 1-20 well) on November 11, 2004. BLM000173. Neither Delta nor WillSource, however, submitted a request for approval of a participating area under section 11 of the Agreement. Instead, they collectively requested and obtained five extensions of time, up until November 30, 2009, in which to begin drilling an additional well. BLM000172, 180–81, 189–90, 205–08, 211, 216–18, 221. WillSource submitted a sixth extension request on October 6, 2009, which the BLM denied on December 14, 2009. BLM000226–27, 276.

While the sixth extension request was pending, on November 30, 2009, WillSource finally submitted an application for approval of a participating area around the Little Beaver 1-20 well. BLM000260–73. BLM approved the application on September 10, 2010. BLM000300–01. Consistent with section 11 of the Agreement, BLM stated in its approval that the participating area was approved effective November 11, 2004—the date the first well was completed. *Id.* On November 9, 2011, the BLM sent a letter to WillSource stating that any lands outside the approved participating area were eliminated as of November 11, 2009, BLM000337, although any leases outside the participating area would be automatically extended for two years. *See* 43 C.F.R. § 3107.4. BLM requested WillSource to submit "a description of the lands eliminated within 90 days from receipt of this letter, as required by Section 2(e) [of the Agreement]." BLM000337.

WillSource did not submit any such description, but instead sent BLM a letter on December 6, 2011, requesting a "one year lease extension" for three leases that had been part of the Willow Creek Unit (collectively, "the Three Leases") but were not included in the participating area.  BLM000340–42.  In response, the BLM issued a decision on June 22, 2012, concluding the Three Leases were eliminated from the Willow Creek Unit by operation of section 2(e), as of the five-year anniversary of the completion of the initial well, or November 11, 2009.  BLM000384–85.  The letter further noted that the Three Leases were automatically extended by two years pursuant to statute, and therefore expired on November 11, 2011.  *Id.*  WillSource did not appeal this decision.

Also on June 22, 2012, BLM separately sent WillSource a notice ordering it to submit a description of the lands eliminated within 30 days.  BLM000382–83.  WillSource sought administrative review of this decision (hereafter, "*WillSource I*").  BLM000420.

On September 10, 2012, WillSource filed a request to "suspend" the leases that BLM had identified as having expired in its decision of June 22, 2012.  BLM000483–85.  BLM denied the request on December 17, 2012, stating that because the leases had already expired, they could not be "suspended."  BLM000603–04.  WillSource also sought administrative review of this decision (hereafter, "*WillSource II*").  BLM000636.

In *WillSource I*, WillSource requested review by the BLM Colorado State Director of the June 22, 2012 Notice, which had ordered WillSource to submit a description of the lands automatically eliminated from the unit. BLM000420. WillSource contended the BLM was estopped from enforcing the terms of the Agreement, based on allegations of misrepresentation further described below. The BLM Colorado State Director rejected these arguments. BLM000711–17. WillSource subsequently appealed to the IBLA, which also rejected the argument. The IBLA concluded the record did not establish the elements for estoppel to apply. *E.g.,* BLM002459–60, BLM002466–68. The IBLA further concluded the express terms of the Agreement meant that lands not part of the approved participating area were eliminated as of November 11, 2009. BLM002452. As the IBLA stated, "[t]he record does not show and WillSource does not allege that any unitized lands were drilled after November 11, 2004, the effective date of the [Willow Creek Unit's] initial participating area, which means that all lands not in that participating area were automatically eliminated . . . on its fifth anniversary, November 11, 2009." *Id.*

In *WillSource II*, WillSource essentially repeated the same arguments it had made in the earlier appeal. It did, however, make one additional argument not asserted in *WillSource I*. In challenging the BLM's denial of its request to "suspend" the Three Leases, WillSource observed that the BLM had granted WillSource a "stay" of the BLM Colorado State Director's review of the June 22, 2012 order, to allow WillSource to

7

gather further documents in support of its appeal. BLM000469–70. The BLM granted the request, stating "[t]he stay is granted due to the time needed to submit the supporting documentation . . . ." *Id.* WillSource argued the "stay" meant that the expiration of the Three Leases had been stayed. BLM000636. Both the BLM Colorado State Director and the IBLA rejected the argument. BLM001486 (State Director); BLM002465 (IBLA).

After the IBLA's rejection of both appeals, WillSource filed this action seeking judicial review of the IBLA's decisions. WillSource argues the IBLA's decisions are arbitrary and capricious and asserts that based on the BLM's "bad actions," WillSource "is entitled to the two-year statutory extension that it lost when the BLM concealed that the status of the [Three Leases] changed." Op. Br. at 39–40.

## II. Analysis

### A. Standard of Review

Under the Administrative Procedure Act, a person suffering a "legal wrong because of agency action" is entitled to judicial review. 5 U.S.C. § 702. A court must "defer to the decisions of the [IBLA], and . . . will set aside an IBLA decision only if it is arbitrary, capricious, otherwise not in accordance with law, or not supported by substantial evidence." *Pennaco Energy, Inc v. United States Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004) (internal quotation omitted). The scope of this review is

narrow, and "a court is not to substitute its judgment for that of the agency." *Motor Vehicles Mfrs. Ass'n v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### B. Estoppel

WillSource's fundamental claim is that the government should be equitably estopped from "retroactively contracting" the Willow Creek Unit, which WillSource alleges caused the Three Leases to expire without notice. Equitable estoppel, however, is rarely available against the government. In fact, the Tenth Circuit has observed "[i]t is far from clear that the Supreme Court would ever allow an estoppel defense against the government under any set of circumstances." *FDIC v Hulsey*, 22 F.3d 1472, 1489 (10th Cir. 1994). Even if it could apply, the Supreme Court has stated "the Government may not be estopped on the same terms as any other litigant," because "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Heckler v . Community Health Servs. of Crawford City*, 467 U.S. 51, 60–61 (1984).

In view of these policy considerations, the Tenth Circuit has held that for equitable estoppel to apply against the government, a party must clear a "high hurdle" by showing affirmative misconduct on the part of the government, in addition to establishing the traditional elements of estoppel. *Hulsey*, 22 F.3d at 1490; *In re DePaolo*, 45 F.3d 373,

376–77 (10th Cir. 1995).  Mere erroneous advice of a government agent does not rise to the level of affirmative misconduct.  *Hulsey*, 22 F.3d at 1490.  Rather, "[a]ffirmative misconduct means an affirmative act of misrepresentation or concealment of a material fact.  Mere negligence, delay, inaction, or failure to follow agency guidelines does not constitute affirmative misconduct."  *Id.* at 377.

WillSource's allegations concerning the BLM's conduct do not rise to the level of affirmative misconduct necessary for equitable estoppel to apply.  WillSource complains that pursuant to a letter dated December 14, 2009, the BLM stated it would notify WillSource as to "the status of Willow Creek Unit and the leases within the Unit" once BLM had processed the participating area application.  BLM000276.  Yet in its September 2010 approval of a participating area, BLM failed to notify WillSource that its approval impacted the Three Leases.  But as the IBLA observed: "At best, WillSource claims that when BLM approved its request for a participating area . . . it failed to describe what would happen to its 'other leases' under the [Unit Agreement].  However, we do not find that a failure to inform the unit operator of what is in its unit agreement constitutes affirmative misrepresentation or concealment of material facts."  BLM002459.

This court agrees with the IBLA's conclusion.  WillSource should have been fully aware of the provisions of the Unit Agreement, particularly section 2(e), which provided all subdivisions of land that are not part of the participating area "on or before the fifth

anniversary of the effective date of the first initial participating area . . . shall be eliminated automatically from this agreement, effective as of said fifth anniversary." 43 C.F.R. § 3181.6. WillSource asserts the BLM "repeatedly . . . and maliciously deceived WillSource," but that allegation appears to be based on WillSource's complaint that the BLM gave it "no notice" of the expiration of the Three Leases outside the participating area. As the government notes, there is no requirement for BLM to notify anyone of an elimination of lands pursuant to section 2(e), and any such elimination is described in that section as automatic. To the extent BLM knew the leases had expired by operation of section 2(e), it could not have "concealed" that knowledge from WillSource because WillSource should have been equally aware of that contractual provision.[2] *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947) (refusing to apply estoppel where farmers relied on government agent's erroneous promise that their entire wheat crop would be insured; the farmers were presumed to know the content of the regulations regardless of the "hardship resulting from innocent ignorance"). This court perceives no affirmative misconduct in the BLM failing to tell WillSource of the effects of a provision in an agreement to which WillSource was itself a party.

---

[2] WillSource's briefing repeatedly stresses that in its various interactions with BLM staff, it was "advised" by the BLM, or received "advice" from the BLM, concerning the Three Leases. Under the Mineral Leasing Act, however, the BLM's role vis-a-vis lessees is regulatory, not fiduciary, and WillSource has cited no authority to the contrary. To the extent WillSource followed the "advice" of BLM staff and not its own legal counsel, it did so at its own peril.

WillSource identifies two more misstatements to support affirmative misconduct. WillSource notes it was billed rent for the leases after their expiration, and that the BLM's publicly available database reflected no change in the status of the leases even after they had expired. The fact that BLM's billing system and database were not updated, however, merely appears to be the result of bureaucratic inefficiency and delay, not affirmative misconduct. Indeed, Defendants note that the billing statements include a disclaimer that they may not be current and "may not include recent changes to your lease." BLM001989–90, 1995–97, 1999–2000. Further, the database carries a disclaimer that BLM makes no warranty for the use of the data for purposes not intended by BLM. BLM002467. This court agrees with the IBLA that these purported misstatements by the BLM do not constitute the sort of affirmative misrepresentations of material facts that can be reasonably relied upon to establish estoppel. *Id.*

Finally, setting aside the question of affirmative misconduct, it is apparent to this court that WillSource cannot establish all of the traditional elements of estoppel. In addition to affirmative misconduct, WillSource must show all of the following: (1) BLM knew or must have known of the true facts; (2) BLM must have intended that its conduct would be acted on or must have acted in a way that WillSource has a right to believe it was so intended; (3) WillSource must be ignorant to the facts; and (4) WillSource must have relied on BLM's conduct to its detriment. *See Hulsey*, 22 F.3d at 1490; *Kowalcyk v.*

*INS*, 245 F.3d 1143, 1149 (10th Cir. 2001). WillSource, however, cannot establish either of the last two elements, because a party asserting estoppel must show not only that it lacked knowledge, but also that it lacked "the means to obtain knowledge of the true facts." *NLRB v. J.D. Indus. Insulation Co.*, 615 F.2d 1289, 1294 (10th Cir. 1980). If the party "had the means by which with reasonable diligence he could acquire the knowledge . . . he cannot claim to have been misled by relying upon the misrepresentation or concealment." *Heckler*, 467 U.S. at 59 n.10 (quoting 3 J. Pomeroy, *Equity Jurisprudence* § 805, at 192 (S. Symons ed. 1941)). As discussed above, the provisions of the Unit Agreement were readily available to WillSource, so it cannot claim to have been misled by the purported misrepresentations of the BLM. Accordingly, WillSource cannot establish the third and fourth elements of estoppel.

In conclusion, this court finds the IBLA's refusal to apply equitable estoppel to be neither arbitrary nor capricious, and therefore affirms the decision of the IBLA.

### C. *"Factual Impossibility"*

WillSource further argues the IBLA's decision was arbitrary and capricious because the conclusion that the Three Leases had already been eliminated prior to the approval of the participating area, is "factually impossible." Here, the application was approved on September 10, 2010, but the BLM deemed the Three Leases to have been

eliminated from the Willow Creek Unit 10 months earlier, on November 11, 2009. BLM000337.  This argument is without merit.

Section 11 of the Unit Agreement states that the "effective date" of a participating area is "the date of completion of" an initial well in the unit area.  43 C.F.R. § 3186.1 (Model Unit Agreement, § 11).  In this case, the initial well, designated the Little Beaver 1-20 well, was completed on November 11, 2004.  BLM000173.  The Unit Agreement further provides that any leases in the unit that are not included in the approved participating area shall expire on the fifth anniversary of the effective date of the participating area—which, in this case, was November 11, 2009.  The BLM therefore correctly identified the expiration date of the Three Leases.  Given the contractual definition of the effective date of a participating area, it was not "factually impossible" for the leases to expire prior to the BLM's approval of WillSource's application.  In addition, as Defendants note, the timing of BLM's approval of the participating area was a function of WillSource having waited more than five years from the completion of the initial well to submit its application.  Indeed, WillSource submitted its application for approval of a participating area *after* the five-year anniversary of the completion of the Little Beaver 1-20 well.

Finally, although the Three Leases were not included in the participating area, they were automatically extended by operation of 43 C.F.R. § 3107.4, which provides that any

lease eliminated from a unit is automatically extended by two years after its elimination. Accordingly, the Three Leases technically had not expired prior to the BLM's September 2010 approval of the participating area. Thus, even accepting WillSource's argument on its own terms, there was no "factual impossibility" because the Three Leases did not expire until more than a year after BLM approved WillSource's application for approval of a participating area.

### D. Mineral Leasing Act

WillSource also contends the BLM exceeded its authority under the Mineral Leasing Act by failing to carry out the purposes of the Act "to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise." Op. Br. at 36 (quoting *Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967)). WillSource argues that BLM instead "engaged in a concerted effort to thwart development by mismanaging WillSource's Leases and concealing material facts about the [Willow Creek Unit] for years." Op. Br. at 37. This court considers this argument merely a restatement of WillSource's estoppel argument, and therefore rejects it. BLM did not mismanage WillSource's leases merely by enforcing the plain terms of the Unit Agreement.

### E. Due Process

WillSource argues the IBLA arbitrarily denied WillSource an evidentiary hearing. WillSource moved for an evidentiary hearing on the grounds that it was necessary to satisfy due process, and because there were issues of material fact requiring evidence to be submitted and evaluated by an Administrative Law Judge. BLM002203–04. IBLA denied the motion, holding that because WillSource had the opportunity to present its position to the BLM, the BLM Colorado State Director, and the IBLA, due process had been satisfied. BLM002445. Additionally, the IBLA held the purported factual questions could be resolved on the basis of the administrative record. *Id.*

This court holds IBLA's denial of an evidentiary hearing was neither arbitrary nor capricious. First, on the issue of disputed facts, WillSource points to the BLM's characterization of its correspondence with WillSource as "not ambiguous." Op. Br. at 35. In response to that characterization, WillSource argues "the evidence in the administrative record overwhelmingly demonstrates" the contrary. *Id.* By resorting to the administrative record, however, WillSource underscores the IBLA's conclusion that factual disputes could be resolved on the basis of the administrative record.

Second, and more significantly, the Tenth Circuit has noted that the IBLA's authority to grant a formal hearing is purely discretionary. *Hoyl v. Babbitt*, 129 F.3d 1377, 1386 (10th Cir. 1997) (citing 43 C.F.R. § 4.415). In *Hoyl*, the Tenth Circuit

rejected the plaintiff's argument that the IBLA violated his due process rights by refusing to provide him a formal evidentiary hearing. The court noted that the IBLA had allowed the plaintiff to present argument and evidence in written form, which was sufficient to satisfy his due process rights. *Id.* That is precisely the case here. As Defendants observe, WillSource was given notice and opportunity to present written arguments and evidence to the IBLA, and indeed WillSource submitted more than 750 pages of argument and evidence. BLM001061–1465, BLM001672–2059. WillSource therefore had a meaningful opportunity to be heard, and the IBLA committed no error in denying WillSource an evidentiary hearing.

### F. *Granting of a Stay*

WillSource's second appeal (*WillSource II*) involved its request to "suspend" the leases that BLM had identified as having expired in its decision of June 22, 2012. BLM000483–85. That request was denied by the BLM. BLM000603–04. While WillSource largely repeats the arguments addressed above, it made one argument unique to *WillSource II*. WillSource observes that at its request, the BLM granted a "stay" of the BLM Colorado State Director's review of the June 22, 2012 decision, in order to allow WillSource to gather further documents in support of its appeal. BLM000469–70. WillSource argues the "stay" meant that the expiration of the Three Leases was

stayed—an argument rejected by the IBLA. BLM002465. The IBLA's rejection of this argument was not arbitrary or capricious.

WillSource's argument is premised on a phrase contained in the BLM's decision granting WillSource's stay request. The decision states that WillSource's request "is granted pending final issuance of [a decision by the BLM State Director]." BLM000462. WillSource argues that language means the "stay" precluded the BLM from considering the Three Leases to be expired until after the BLM State Director issued a decision. While the language of the BLM's order granting the stay is not a model of clarity, in context it is clear that the stay had no effect on the expired leases, but rather was intended to allow WillSource additional time "to gather documents from the Forest Service and the BLM to submit prior to the requested oral presentation for the [BLM State Director Review]." BLM000462. Moreover, as discussed above, the leases had already expired as of November 11, 2011 pursuant to the Unit Agreement and relevant regulations, and BLM had no legal authority to revive the expired leases, much less the authority to do so based on a request for additional time to submit documents.

### III. Conclusion

For the foregoing reasons, this court AFFIRMS the decisions of the IBLA.

DATED: August 28, 2020                    BY THE COURT:

*s/Timothy M. Tymkovich*
Hon. Timothy M. Tymkovich